AO 93C  (Rev. 8/18) Warrant by Telephone of Other Reliable Electronic Means            ☐ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
for the
Central District of California

| | |
|---|---|
| In the Matter of the Search of | ) |
| *(Briefly describe the property to be searched or identify the person by name and address)* | ) |
| | ) Case No.  2:20-MJ-04864 |
| 9816 Belmont Street | ) |
| Bellflower, CA 90706 | ) |
| | ) |
| | ) |
| | ) |

## WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

To:      Any authorized law enforcement officer

An application by a federal law enforcement officer or an attorney for the government requests the search of the following person or property located in the Central District of California *(identify the person or describe the property to be searched and give its location)*:

*See Attachment A-2*

I find that the affidavit(s), or any recorded testimony, establish probable cause to search and seize the person or property described above, and that such search will reveal *(identify the person or describe the property to be seized)*:

*See Attachment B*

Such affidavit(s) or testimony are incorporated herein by reference and attached hereto.

**YOU ARE COMMANDED** to execute this warrant on or before <u>14 days from the date of its issuance</u> *(not to exceed 14 days)*

☒ in the daytime 6:00 a.m. to 10:00 p.m.   ☐ at any time in the day or night because good cause has been established.

Unless delayed notice is authorized below, you must give a copy of the warrant and a receipt for the property taken to the person from whom, or from whose premises, the property was taken, or leave the copy and receipt at the place where the property was taken.

The officer executing this warrant, or an officer present during the execution of the warrant, must prepare an inventory as required by law and promptly return this warrant and inventory to <u>the U.S. Magistrate Judge on duty at the time of the return through a filing with the Clerk's Office.</u>

☐ Pursuant to 18 U.S.C. § 3103a(b), I find that immediate notification may have an adverse result listed in 18 U.S.C. § 2705 (except for delay of trial), and authorize the officer executing this warrant to delay notice to the person who, or whose property, will be searched or seized *(check the appropriate box)*

☐ for ____ days *(not to exceed 30)*   ☐ until, the facts justifying, the later specific date of _____.

Date and time issued:     <u>10/9/20   11:45 A.M.</u>          _____
                                                                                      *Judge's signature*

City and state:      <u>Los Angeles, CA</u>          <u>HON. CHARLES F. EICK, Magistrate Judge</u>
                                                                              *Printed name and title*

AUSA:  Ranee A. Katzenstein (X2432)

AO 93C  (Rev. 8/18) Warrant by Telephone of Other Reliable Electronic Means (Page 2)

*(Page 2)*

| **Return** | | |
|---|---|---|
| Case No.:<br>2:20-MJ-04864 | Date and time warrant executed:<br>10/20/20 at 7:30 am | Copy of warrant and inventory left with:<br>Gabriella Llerenas' daughter |

Inventory made in the presence of :
  Michael Blas

Inventory of the property taken and name of any person(s) seized:
  Please see the following five pages.

**Certification**

       I declare under penalty of perjury that this inventory is correct and was returned along with the original warrant to the designated judge.

Date:  10/26/20

                                 *Michael Blas*
                                         *Executing officer's signature*

                               Michael Blas, ASAC
                                         *Printed name and title*

## Department of Labor
### Office of Inspector General



# Search Inventory

Case Name/Number: _I·209103405-T_

Case Agent: _McNulty_

Evidence Custodian(s): _SA Al. VALLE_

Date of Execution: _10/20/20_

Search Address: _17033 LA NINA LANE REDDIS CA_

Room #/Letter: _I/ K/E/M/A AA/O_

| Evidence Item | Description of Evidence | Seizing Agent | Box # |
|---|---|---|---|
| I·8 | APPLE IPAD | VALLE | 2 |
| I·9 | APPLE IPAD | | |
| I·10 | APPLE MAC BOOK | | |
| I·11 | WD EXTERNAL HD | | |
| I·12 | EXTERNAL HD | | |
| I·13 | SKY DEVICE CELL PHONE | | |
| I·14 | APPLE CELL PHONE | | |
| I·15 | APPLE CELL PHONE | | |
| K·1 | MACBOOK PRO CO2DS3REP3YN | | |
| E·1 | APPLE MACBOOK PRO CO2RPMNLFVH5 | | |
| E·2 | PAVILION HP i3-AN0031WM | | |
| M·1 | APPLE IPAD S/N FGQT2020FK15 | | |
| M·2 | IPAD APPLE S/N DMPQNSWSEGW1 | | |
| K·2 | APPLE IPHONE (RED) | | |
| A·1 | APPLE IPHONE | | |
| AA·2 | UNK THUMB DRIVE 64GB | | |
| AA·3 | THUMB DRIVE KINGSTON DT50 (16GB) | | |
| O·1 | MAC ALL IN ONE S/N CO2T304XGG7N | | |
| O·2 | USB THUMBDRIVE SANDISK CRUZER 8GB | | |
| O·3 | USB THUMBDRIVE LMPREX | | |
| O·4 | USB THUMBDRIVE SP 64GB | | |
| O·5 | MOBILE PHONE CO2 PAD | | |
| | | | |
| | | | |
| | | | |

Page __3__ of __53__

**U.S. Department of Labor**
Office of Inspector General



# Search Inventory

Case Name/Number: _I-209103405-J_     Case Agent: _SA McNulty_

Evidence Custodian(s): _SA MARCUS VALLE_     Date of Execution: _10·20·20_

Search Address: _17033 LA MINA LANE PERRIS CA_  Room #/Letter: _HH/I/A/AA/FF_

| Evidence Item | Description of Evidence | Seizing Agent | Box # |
|---|---|---|---|
| HH 1 | EDD / W2 / PII | VALLE | 1 |
| HH 2 | ROSTERS W/ HANDWRITTEN PII | ~~GHER~~ VALLE | |
| HH 3 | EDD CORRESPONDENCE / BLK CALENDAR | VALLE | |
| HH 4 | EDD DOCS | VALLE | |
| I-1 | ENVELOPES | VALLE | |
| I-2 | DL IN OTHER NAMES | VALLE | |
| HH·5 | NOTEPAD W/ EDD PII | VALLE | |
| I-3 | EDD MAIL | VALLE | |
| I-4 | LUXURY GOODS RECEIPTS W/ DIFFERENT DEBIT CARDS | VALLE | |
| I-5 | 4 SSN NOTEBOOKS | VALLE | |
| I-6 | EDD DEBIT CARDS | VALLE | |
| I-7 | $29,224.06 CASHIERS CHK | VALLE | |
| FF-1 | EDD DOCS / COPY OF PASSPORT | VALLE | |
| AA-1 | EDD MAIL / PII / W2's | VALLE | |
| I-8 | SSN CARD & BIRTH CERTIFICATE | VALLE | |
| A-2 | EDD DEBIT CARD | VALLE | |
| HH-6 | PII NOTEBOOKS | VALLE | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

**U.S. Department of Labor**
Office of Inspector General

# Search Inventory

Case Name/Number: _I-20910340S-J_          Case Agent: _McNerly_

Evidence Custodian(s): _SA M. VALLE_          Date of Execution: _10/20/20_

Search Address: _17033 LA MINA LANE PERRIS CA_          Room #/Letter: _I / K / E / M / A / AA / O_

| Evidence Item | Description of Evidence | Seizing Agent | Box # |
|---|---|---|---|
| I 8 | APPLE IPAD | VALLE | 2 |
| I 9 | APPLE IPAD | | |
| I 10 | APPLE MAC BOOK | | |
| I 11 | WD EXTERNAL HD | | |
| I-12 | EXTERNAL HD | | |
| I-13 | SKY DEVICE CELL PHONE | | |
| I-14 | APPLE CELL PHONE | | |
| I-15 | APPLE CELL PHONE | | |
| K-1 | MACBOOK PRO C02D53REP3YN | | |
| E-1 | APPLE MACBOOK PRO C02KPMNVFVH5 | | |
| E-2 | PAVILION HP 13-AN0031WM | | |
| M-1 | APPLE IPAD S/N FGQT2020FK15 | | |
| M-2 | IPAD APPLE S/N DMPQN5WSEGW1 | | |
| K-2 | APPLE IPHONE (RED) | | |
| A-1 | APPLE IPHONE | | |
| AA-2 | UNK THUMBDRIVE 64GB | | |
| AA-3 | THUMB DRIVE KINGSTON DT50 (16GB) | | |
| O-1 | MAC ALL IN ONE S/N C02T304XGG7N | | |
| O-2 | USB THUMBDRIVE SANDISK CRUZER 8GB | | |
| O-3 | USB THUMBDRIVE EMPREX | | |
| O-4 | USB THUMBDRIVE SP 64GB | | |
| O-5 | MOBILE PHONE CID PAD | | |

**U.S. Department of Labor**
Office of Inspector General

# Search Inventory

Case Name/Number: _I-209103405-J_    Case Agent: _SA McNerley_

Evidence Custodian(s): _SA M. VALLE_    Date of Execution: _10/20/20_

Search Address: _17033 LA MINA LANE PERRIS CA_    Room #/Letter: _____

| Evidence Item | Description of Evidence | Seizing Agent | Box # |
|---|---|---|---|
| #1 BAG | BULK CASH | BU1 | |
| #2 BAG | BULK CASH | BU1 | |
| #3 BAG | BULK CASH | BU1 | |
| #4 BAG | BULK CASH | BU1 | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

## ** INVENTORY REPORT **

CLIENT : BANK OF AMERICA US TREASURY

SITE : LOS ANGELES

GLORY ID : 263539

10/21/20  Time:  09:19 AM

| Media | Count | Amount |
|---|---|---|
| US $1 | 51 | $51.00 |
| US $2 | 19 | $38.00 |
| US $5 | 27 | $135.00 |
| US $10 | 427 | $4,270.00 |
| US $20 | 5734 | $114,680.00 |
| US $50 | 1521 | $76,050.00 |
| US $100 | 4259 | $425,900.00 |

--------------------------------------

| US Curr | $621,124.00 |
|---|---|

--------------------------------------

| Total - US | $621,124.00 |
|---|---|

--------------------------------------

| Cash | $621,124.00 |
|---|---|
| Non Cash | $0.00 |

--------------------------------------

| Inventory Total | $621,124.00 |
|---|---|

--------------------------------------

-------- END OF INVENTORY REPORT --------

## ATTACHMENT A-2

**SUBJECT PREMISES 2 is** located at 9816 Belmont Street, Bellflower, CA 90706. **SUBJECT PREMISES 2** is part of a single story beige stucco commercial building, which also includes three other similar spaces assigned to three separate businesses. There is a large, single-pane glass window filling approximately four fifths of the bottom half of the façade of **SUBJECT PREMISES 2.** A white paper sign, visible through the center of the window, says "CDL Income Tax Services (310) 714-8012 Cellular." The area below this window is faced with red bricks. To the right of the window is the entrance to **SUBJECT PREMISES 2.** The numerals "9816" appear in black in a yellow, lozenge shaped sign affixed above the entrance, which includes a white metal security screen door.

**SUBJECT PREMISES 2** includes all attached and unattached rooms, attics, garages, vehicles on the driveway and/or parked on the street directly outside the premises, storage areas and units, boxes, safes, lockers, bags, trash bins or bags, trash areas, mailboxes, any other common areas associated with the premises (such as a common mail receiving area), and any containers found in the aforementioned areas.

**SUBJECT PREMISES 2** are further described in the photo comprising Exhibit 2, below.

EXHIBIT 2



**ATTACHMENT B**

I.   **ITEMS TO BE SEIZED**

1.   The items to be seized are evidence, contraband,
fruits, and/or instrumentalities of violations of Title 18,
United States Code, Sections 1029 (Fraud and Related Activity in
Connection with Access Devices), 1040 (Fraud in Connection with
Emergency Benefits), 1341 (Mail Fraud), 1343 (Wire Fraud) and
1349 (Attempt and Conspiracy to commit Mail Fraud) (the "SUBJECT
OFFENSES"):

a.   For the period of January 1, 2020, to the
present, records, documents, correspondence, faxes, and e-mails
sent to and received from any individual regarding eligibility
for, applications for and/or the receipt of Unemployment
Insurance, including obtaining and using debit cards to access
Unemployment benefits.

b.   For the period of January 1, 2020, to the
present, records, documents, correspondence, faxes, and e-mails
sent to and received from any State Workforce Agency including
the California Employment Development Department, including any
applications for Unemployment Insurance.

c.   For the period of January 1, 2020, to the
present, records and documents containing information, including
Personally Identifiable Information, e.g., names, Social
Security Numbers, dates of birth, addresses, phone numbers, and
driver's license numbers, to be used in support of any
application for Unemployment Insurance, and/or any claim of
continuing eligibility for Unemployment Insurance.

1

       d.    For the period of January 1, 2020, to the present, checks and EBP cards received from any State Workforce Agency including the California Employment Development Department.

       e.    For the period of January 1, 2020, to the present, payroll and personnel records, receipts, IRS Forms W-2, IRS Forms W-4, IRS Forms 1099, State and Federal Tax Returns.

       f.    Copies of and actual driver licenses, state identification cards, passports, and other forms of identification.

       g.    Indicia of occupancy, residency, control, and/or ownership of the SUBJECT PREMISES, including utility bills, telephone bills, loan payment receipts, rent documents, keys, photographs, and bank records.

       h.    For the period of January 1, 2020, to the present, bank records or records received from financial institutions, including debit cards; correspondence regarding debit card accounts; wire transfer records; bank statements and associated transactional records; money drafts; letters of credit; safety deposit box keys and records; checkbooks; money wrappers; money containers; income tax records; payroll records; credit cards; and any other records of financial transactions that reflect the disposition and/or allocation of monies.

       i.    Cash or cash equivalents such as pre-paid cards in excess of $500.

   j. For the period of January 1, 2020, to the present, records relating to the acquisition, secreting, transfer, concealment, and/or expenditure of money.

   k. Any digital device which is itself or which contains evidence, contraband, fruits, or instrumentalities of the SUBJECT OFFENSES, and forensic copies thereof.

   l. With respect to any digital device containing evidence falling within the scope of the foregoing categories of items to be seized:

    i. evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

    ii. evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

    iii. evidence of the attachment of other devices;

    iv. evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

    v. evidence of the times the device was used;

vi.  passwords, encryption keys, biometric keys, and other access devices that may be necessary to access the device;

vii. applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

viii.  records of or information about Internet Protocol addresses used by the device;

ix.  records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

2.  As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

3.  As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as telephone paging devices, beepers, mobile telephones, and smart phones; digital cameras; gaming consoles (including Sony PlayStations and Microsoft Xboxes); peripheral input/output

devices, such as keyboards, printers, scanners, plotters,
monitors, and drives intended for removable media; related
communications devices, such as modems, routers, cables, and
connections; storage media, such as hard disk drives, floppy
disks, memory cards, optical disks, and magnetic tapes used to
store digital data (excluding analog tapes such as VHS); and
security devices.

II.   **SEARCH PROCEDURE FOR DIGITAL DEVICES**

     4.   In searching digital devices or forensic copies
thereof, law enforcement personnel executing this search warrant
will employ the following procedure:

          a.   Law enforcement personnel or other individuals
assisting law enforcement personnel (the "search team") will, in
their discretion, either search the digital device(s) on-site or
seize and transport the device(s) and/or forensic image(s)
thereof to an appropriate law enforcement laboratory or similar
facility to be searched at that location.  The search team shall
complete the search as soon as is practicable but not to exceed
120 days from the date of execution of the warrant.  The
government will not search the digital device(s) and/or forensic
image(s) thereof beyond this 120-day period without obtaining an
extension of time order from the Court.

          b.   The search team will conduct the search only by
using search protocols specifically chosen to identify only the
specific items to be seized under this warrant.

               i.   The search team may subject all of the data
contained in each digital device capable of containing any of

5

the items to be seized to the search protocols to determine whether the device and any data thereon falls within the list of items to be seized.  The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the list of items to be seized.

   ii.  The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

   iii. The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

   c.   The search team will not seize contraband or evidence relating to other crimes outside the scope of the items to be seized without first obtaining a further warrant to search for and seize such contraband or evidence.

   d.   If the search determines that a digital device does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the device and delete or destroy all forensic copies thereof.

   e.   If the search determines that a digital device does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

   f.   If the search determines that a digital device is (1) itself an item to be seized and/or (2) contains data falling

within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

g. The government may also retain a digital device if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

h. After the completion of the search of the digital devices, the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

5. The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts. Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

6.    In order to search for data capable of being read or interpreted by a digital device, law enforcement personnel are authorized to seize the following items:

a.    Any digital device capable of being used to commit, further, or store evidence of the offenses listed above;

b.    Any equipment used to facilitate the transmission, creation, display, encoding, or storage of digital data;

c.    Any magnetic, electronic, or optical storage device capable of storing digital data;

d.    Any documentation, operating logs, or reference manuals regarding the operation of the digital device or software used in the digital device;

e.    Any applications, utility programs, compilers, interpreters, or other software used to facilitate direct or indirect communication with the digital device;

f.    Any physical keys, encryption devices, dongles, or similar physical items that are necessary to gain access to the digital device or data stored on the digital device; and

g.    Any passwords, password files, biometric keys, test keys, encryption codes, or other information necessary to access the digital device or data stored on the digital device.

7.    During the execution of this search warrant, law enforcement is permitted to: (1) depress GABRIELLA LLERENAS' and CARLOS LLERENAS' thumb and/or fingers onto the fingerprint sensor of the device (only when the device has such a sensor), and direct which specific finger(s) and/or thumb(s) shall be

8

depressed; and (2) hold the device in front of GABRIELLA LLERENAS' and CARLOS LLERENAS' face with his or her eyes open to activate the facial-, iris-, or retina-recognition feature, in order to gain access to the contents of any such device.  In depressing a person's thumb or finger onto a device and in holding a device in front of a person's face, law enforcement may not use excessive force, as defined in Graham v. Connor, 490 U.S. 386 (1989); specifically, law enforcement may use no more than objectively reasonable force in light of the facts and circumstances confronting them.

8.   The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

**AFFIDAVIT**

I, Colin R McNulty, declare and state as follows:

**I.  INTRODUCTION**

1.  I am a Special Agent ("SA") with the United States
Department of Labor ("DOL"), Office of Inspector General
("OIG"), and have served in this capacity for three years.  I am
presently assigned to the Las Vegas field office.  My
responsibilities as a DOL-OIG Special Agent include
investigating unemployment insurance fraud, mail fraud, identity
theft, as well as other related crimes.  I am a graduate of the
Federal Law Enforcement Training Center (FLETC) in Glynco,
Georgia.  As part of the training provided at FLETC, I
successfully completed the Basic Training course, which included
courses in criminal and constitutional law.  Prior to my
employment with DOL-OIG I was employed as a Federal Air Marshal.

**II. PURPOSE OF AFFIDAVIT**

2.  I make this affidavit in support of an application for
warrants to search the single family residence of located at
17033 La Mina Lane, Perris, CA 92570-9835 (**SUBJECT PREMISES 1**),
and the business office of CDL Income Tax Services located at
9816 Belmont Street, Bellflower, CA 90706 (**SUBJECT PREMISES 2**),
which are described in Attachments A-1 and A-2, for evidence,
fruits and instrumentalities of violations of Title 18, United
States Code, Sections 1029 (Fraud and Related Activity in

1

Connection with Access Devices),[1] 1040 (Fraud in Connection with Emergency Benefits),[2] 1341 (Mail Fraud),[3] 1343 (Wire Fraud),[4] and 1349[5] (Conspiracy to Commit Mail Fraud) (collectively, the "**SUBJECT OFFENSES**"), as described more fully in Attachment B. Attachments A-1 and A-2, and Attachment B are incorporated by reference herein.

---

[1] Among other offenses, 18 U.S.C § 1029 provides that whoever "knowingly and with intent to defraud possesses fifteen or more devices which are counterfeit or unauthorized access devices" shall be guilty of an offense against the United States. 18 U.S.C. § 1029(a)(4).  The statute provides that the term "unauthorized access device" includes any access device that is "obtained with intent to defraud."  18 U.S.C. § 1029(e)(3).

[2] Section 1040 of Title 18 provides that whoever "(1) falsifies, conceals, or covers up any trick, scheme or device any material fact; or (2) makes any materially false, fictitious, or fraudulent statement or representation, or makes or uses any false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or representation, in any matter involving any benefit authorized . . . . transmitted, transferred, disbursed, or paid in connection a major disaster declaration under section 401 of the Robert T. Stafford Disaster Relief and Emergency Assistance Act (42 U.S.C. 5191)" where the payment of the benefit affects interstate commerce or the benefit is at any point transmitted in the mail, shall be guilty of an offense against the United States.

[3] Section 1341 of Title 18 provides that whoever, having devised a scheme to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises, uses the mail to execute such scheme, shall be guilty of an offense against the United States.

[4] Section 1343 of Title 18 provides that whoever, having devised a scheme to defraud, or for obtaining money or property by means of false or fraudulent pretenses, representations or promises, uses interstate wirings to execute such scheme, shall be guilty of an offense against the United States.

[5] Section 1349 of Title 18 provides that whoever attempts or conspires to commit mail fraud shall be guilty of an offense against the United States.

3.    The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III. <u>PREMISES TO BE SEARCHED</u>

4.    **SUBJECT PREMISES 1** is residential property located at 17033 La Mina Lane, Perris, CA 92570-9835.  The property is surrounded by a white fence that bears the number 17033. **SUBJECT PREMISES 1 includes** a one-story ranch house that is painted in two brownish colors with beige trim and has a brown tile roof.  A three-car garage, with a double-wide door on the left and a single door on the right, is on the left side of the house and is reached by a paved driveway.  The front door of the house is a double door with large glass windows. **SUBJECT PREMISES 1** also includes a separate, two-bedroom casita behind the main house, a cabin with a kitchenette, and a covered RV storage/horse shelter.   **SUBJECT PREMISES 1** is more fully described in Attachment A-1, which includes photographs of **SUBJECT PREMISES 1** as Exhibit 1.

5.    **SUBJECT PREMISES 2 is** located at 9816 Belmont Street, Bellflower, CA 90706.  **SUBJECT PREMISES 2** is part of a single

3

story beige stucco commercial building, which also includes
three other similar spaces assigned to three separate
businesses.  There is a large, single-pane glass window filling
approximately four fifths of the bottom half of the façade of
**SUBJECT PREMISES 2.**  A white paper sign, visible through the
center of the window, says "CDL Income Tax Services (310) 714-
8012 Cellular."  The area below this window is faced with red
bricks.  To the right of the window is the entrance to **SUBJECT
PREMISES 2.**  The numerals "9816" appear in black in a yellow,
lozenge shaped sign affixed above the entrance, which includes a
white metal security screen door.  **SUBJECT PREMISES 2** is more
fully described in Attachment A-2, which includes a photograph
of **SUBJECT PREMISES 2** as Exhibit 2.

## IV. <u>STATEMENT OF PROBABLE CAUSE</u>

### A.   Summary of Probable Cause

6.   The U.S. DOL-OIG, California Employment Development
Department ("EDD"), United States Postal Inspection Service, and
Social Security Administration-Office of Inspector General are
investigating a fraudulent scheme in which the perpetrators
fraudulently apply for and obtain Unemployment Insurance ("UI")
benefits under the Pandemic Unemployment Assistance ("PUA")
provision of the federal CARES Act, a provision that is designed
to help unemployed individuals obtain UI benefits as part of the
nation's response to the economic harms caused by COVID-19.

7.   The investigation has obtained evidence that GABRIELA
LLERENAS ("LLERENAS"), also known as (aka) "Maria G. Sandoval,"

has filed and caused the filing with EDD of fraudulent UI benefits claims that falsely assert the named claimants are self-employed independent contractors who were negatively affected by the COVID-19 pandemic, triggering eligibility for UI benefits under the PUA provision of the CARES Act. The UI applications submitted in furtherance of the scheme falsely report inflated income to EDD for the named claimants in order to receive the maximum benefit amount. By falsely asserting that the claimants are residents who worked in California and are eligible for UI benefits, LLERENAS misrepresents that the named claimants are entitled to UI benefits administered by EDD when, in fact, they are not.

8. The submission of the applications for UI benefits causes mailings to the addresses provided on the applications, including mailings of Electronic Bill Payment ("EBP") debit cards administered by Bank of America ("BofA") that are used to access the fraudulently obtained UI benefits.

9. In some instances, LLERENAS charges a fee to prepare the UI application in the name of a claimant. In these instances, the named claimant's address is provided on the application (thereby concealing LLERENAS' role) and the named claimant receives the EBP debit card and is expected to pay LLERENAS. In other instances, the address provided on the UI application is controlled by LLERENAS' or an associate, including ELIU ALMONTE MURILLO ("MURILLO"), who can use the EBP debit card that is sent to access the UI benefits directly.

10. LLERENAS has also defrauded and attempted to defraud at least one of the named claimants by falsely representing that she is employed by EDD and can control the distribution of UI benefits, and then demanding additional payment from the named claimant in return for "releasing" the benefits.

11. The fraudulent UI claims are submitted electronically using three IP addresses that are registered to **SUBJECT PREMISES 1 and 2**. Two of the IP addresses used to submit at least 137 UI claims to EDD as part of the scheme are registered to **SUBJECT PREMISES 1**. Publicly available information indicates that **SUBJECT PREMISES 1** is owned by LLERENAS and CARLOS LLERENAS, and vehicles registered to LLERENAS have been observed parked in the driveway of **SUBJECT PREMISES 1.** CARLOS LLERENAS has identified **SUBJECT PREMISES 1** as his residence on his California Driver's License. The third IP address used to submit to EDD the remaining 66 claims that have been identified to date as part of the scheme is registered to **SUBJECT PREMISES 2**. Publicly available information shows that **SUBJECT PREMISES 2** is an income tax preparation business controlled by CARLOS LLERENAS.

**B.   Unemployment Benefits**

12. Since 1935, The U.S. Department of Labor's Unemployment Insurance (UI) program has provided unemployment benefits to eligible workers who become unemployed through no fault of their own. This program ensures that at least a significant portion of the necessities of life -- most notably food, shelter, and clothing -- are met on a weekly basis while

6

the worker seeks employment.  UI beneficiaries who meet the
requirements of the applicable state law are eligible for this
temporary financial assistance.  Each state administers a
separate UI program within the guidelines established by Federal
law.  In the state of California, EDD administers the UI program
for residents and others physically performing work activities
in California.

13.  Generally speaking, regular UI claimants must be:
(1) unemployed through no fault of their own; (2) able and
available for work; (3) willing to accept suitable work; and
(4) actively seeking work.

**C.   Pandemic Unemployment Assistance under the CARES Act**

14.  On March 13, 2020, the President of the United States
declared COVID-19 an emergency under the Robert T. Stafford
Disaster Relief and Emergency Assistance Act.  As a result,
Congress passed the Coronavirus Aid, Relief, and Economic
Security Act ("CARES Act"), which the President signed into law
on March 27, 2020.  The CARES Act provides over $2 trillion in
economic relief protections to the American people from the
public health and economic impacts of COVID-19.

15.  Prior to the enactment of the CARES Act, to be
eligible for UI administered by EDD, a person must have been
employed and worked in California and received at least a
certain amount of wages from an employer in the 18 months
preceding his/her UI benefits claim.  Because of this
requirement, self-employed workers, independent contractors, and

employees with insufficient earnings were not eligible to receive regular UI benefits.

16. The CARES Act established a new program – Pandemic Unemployment Assistance ("PUA") -- to provide unemployment benefits during the COVID-19 pandemic to people who do not qualify for regular unemployment insurance benefits including business owners, self-employed workers, independent contractors, and those with a limited work history who are out of business or have significantly reduced their services as a direct result of the pandemic. UI benefits provided under the PUA program are sometimes referred to as PUA benefits.

17. Under the PUA provisions of the CARES Act, a person who is a business owner, self-employed worker, independent contractor, or gig worker can qualify for PUA benefits administered by EDD if he/she previously performed such work in California and is unemployed, partially unemployed, unable to work, or unavailable to work due to a COVID-19-related reason.[6]

---

[6] COVID-19 related reasons for being out of work include: being diagnosed with COVID-19 or experiencing symptoms of COVID-19 and seeking a medical diagnosis; being unable to work because a health care provider advised self-quarantining due to concerns related to COVID-19; having a household member who has been diagnosed with COVID-19; providing care for a family or household member who has been diagnosed with COVID-19; having primary caregiving responsibility for a child or other household member who is unable to attend school or another facility that is closed as a direct result of the COVID-19 and the school or facility care is required for the claimant to work; becoming the breadwinner or major support for a household because the head of household died due to COVID-19; the claimant has quit his/her job due to COVID-19; the place of employment has closed due to COVID-19; a job that the claimant was scheduled to start is no longer available due to the COVID-19 public health emergency; or the place of employment is inaccessible due to the COVID-19 public health emergency.

Examples of non-business-owner occupations that may qualify a person for PUA benefits are realtor, barber, hairstylist, freelance photographer, construction handyman/woman, gardener, and ride-share driver.[7]

18. EDD began accepting applications for PUA benefits on April 28, 2020. To make benefits available as quickly as possible, payments are issued in phases. If a claimant qualifies for PUA benefits, the minimum payments are as follows based on the claim's start date:

> Phase 1: For claims with start dates from February 2 to March 28, 2020, $167 per week for each week the claimant is unemployed due to COVID-19.
>
> Phase 2: For claims with start dates from March 29 to July 25, 2020, $167 plus $600 per week for each week the claimant is unemployed due to COVID-19.
>
> Phase 3: For claims with start dates from July 26 to December 26, 2020, $167 per week for each week the claimant is unemployed due to COVID-19.

19. PUA applicants may be eligible for more than the minimum weekly benefit amount of $167 if their annual income for 2019 reported on the PUA application meets a minimum threshold.

---

[7] To be eligible, such person must also not be participating in the UI Elective Coverage program. Under the provisions of the California Unemployment Insurance Code (CUIC), employers may elect Unemployment Insurance (UI) and State Disability Insurance (SDI) or only Disability Insurance (DI) coverage for themselves. Self-employed individuals, who are not employers, may only elect SDI coverage for themselves.

20. A UI claimant can usually collect 26 weeks of regular state UI benefits.  The CARES Act provides for additional Pandemic Emergency Unemployment Compensation ("PEUC"), which provides up to 13 weeks of additional payments, for a total of 39 weeks of benefits.  PEUC is available to persons who were or are fully or partially unemployed at any time between from March 29 through December 26, 2020.  Persons with a regular UI claim, a PUA claim or a PEUC extension filed between March 29 and July 25, 2020, also receive Federal Pandemic Unemployment Compensation ("FPUC"), which is the extra $600 per week.

21. Persons applying for PUA benefits do not need to submit any supporting documents to the EDD with their applications.  Claimants enter their total income for the 2019 calendar year on the application.  The stated income will be used to pay the minimum benefits of $167 per week.  EDD may request documentation to provide proof of the stated income.[8] If the income information provided by the PUA claimant meets an annual earnings threshold of $17,368 or more, the EDD will work as quickly as possible to verify the claimant's income using other resources available to EDD in order to increase the PUA weekly benefit amount.

22. Like regular UI claims, PUA claims can be filed online.  When an individual files a PUA claim online, EDD automatically maintains certain information regarding the filing of the claim.  This information includes the date and time the

---

[8] In general, EDD accepts items such as an annual tax return, 1099 forms, W-2s, and pay stubs as proof of income.

claim was submitted, the name of the person for whom the claim was filed, and the IP address of the computer, or ISP account, that was used to file the claim.

23.  A PUA claimant must answer various questions to establish his/her eligibility for PUA benefits.  The claimant must provide his/her name, Social Security Number, and mailing address.  The claimant must also identify a qualifying occupational status and COVID-19 related reason for being out of work.

24.  After it accepts a UI claim, including a claim submitted pursuant to the PUA program, EDD typically deposits UI funds every two weeks to an Electronic Bill Payment ("EBP") debit card administered by the Bank of America ("BofA"), which the claimant can use to pay for his/her expenses.  The EBP card is sent via the U.S. Postal Service to the claimant at the address the claimant provides in their UI claim.  Claimants can activate their debit card over the phone or online.

25.  When receiving regular UI benefits, a claimant must complete a Continued Claim Form (DE 4581) and certify every two weeks, under penalty of perjury, that he/she remains unemployed and eligible to receive UI benefits. EDD authorizes and deposits payment to the EBP debit card after it receives the Continued Claim Form.  On or about April 23, 2020, California Secretary of Labor Julie Su directed the EDD to temporarily suspend the requirement for UI claimants to provide unemployment

certifications (Continued Claim Forms).[9]  The Continued Claim Form was waived to prevent any unnecessary delays in dispensing benefit payments.

26. At present, weekly PUA benefits typically range from $40 to $450.  In order to receive the maximum weekly benefit of $450, a claimant must have earned $11,674.01 or more in the highest quarter of the claimant's base employment period.

### D.   Background Information regarding GABRIELA LLERENAS

27. EDD Criminal Investigator Dolores Wilder (CI Wilder) has informed me that she learned the following from the Human Resources Division of EDD:

a.   LLERENAS is also known as "Maria G. Sandoval"[10] and was employed under that name by EDD from September 11, 2000, to March 28, 2002.

b.   On or about March 28, 2002, LLERENAS voluntarily resigned from EDD after admitting to fraudulently processing and paying entire claims, and receiving checks mailed to addresses that she, or persons known to her, controlled.

c.   On or about April 11, 2002, LLERENAS was indicted on 25 counts of mail fraud, in violation of 18 U.S.C. § 1341, in United States v. Sandoval et al., Case No. 2:02-cr-00150-LKK

---

[9] The temporary suspension of the continued claims forms covered the weeks ending March 14, 2020 through May 9, 2020.

[10] EDD Criminal Investigator Dolores Wilder investigated "Maria Sandoval" in 2002 and recognizes LLERENAS as the person she knew as "Maria Sandoval."  Investigator Wilder also determined that the Social Security Number "Maria Sandoval" used is the same number as is being used by LLERENAS.

(E.D. Ca.).  The charges arose from a scheme to obtain
fraudulent disability benefits administered by EDD.  On August
2, 2001, a superseding indictment was filed adding a twenty-
sixth mail fraud count.  LLERENAS pleaded guilty to counts one
and 26 of the superseding indictment and was sentenced on
February 19, 2003, to 37 months in the custody of the Bureau of
Prisons, to be followed by three years of supervised release,
and ordered to pay $900,000 in restitution.

        d.  On or about May 29, 2014, "Maria Gabriela
Sandoval" was charged with false statement, representation or
concealment, grand theft of personal property, forgery, identity
theft, and insurance fraud, in violation of California
Unemployment Insurance (UI) Code 2101(A) (eight counts),
California Unemployment Insurance Code 2116, California Penal
Code (PC) 487(A), California PC 470(A), California PC 530.5(A)
and California PC 550(A)(1).  On or about May 7, 2015, LLERENAS
aka Sandoval was convicted of two counts of violating UI Code
2101(A), and one count of violating each of UI Code 2116, PC
487(A), PC 530.5(A) and PC 550(A)(1), for a total of six felony
counts, and sentenced to five years' probation and 365 days jail
(suspended).

     28.  LLERENAS does not currently work for EDD.

    **E.  The Scheme to Fraudulently Obtain UI Benefits**

       **1.  <u>The Fraudulent Claim Submitted for CW1</u>**

    29. On August 31, 2020, Cooperating Witness 1 (CW1)
contacted EDD and alleged that an EDD employee from the UI

department was attempting to extort CW1 for assisting CW1 to obtain UI payments.[11]

30. On September 3, 2020, DOL-OIG and EDD agents interviewed CW1, who provided the following information:

a. In or around June 2020, CW1's friend "Eli," known to agents as Eliu Almonte Murillo ("MURILLO") told CW1 that MURILLO had a cousin who worked at EDD. MURILLO said that her cousin helped people file UI claims and could help CW1 file a UI claim. MURILLO said that her cousin helped MURILLO receive $9,000 in UI benefits and her sister (name unknown) receive $12,000 in UI benefits. MURILLO said that everybody paid her cousin to file their UI claims. MURILLO said that sometimes people paid her cousin by giving a portion of their UI benefits to MURILLO, who sent them to her cousin. CW1 expressed interest in using MURILLO'S cousin to file a UI claim because CW1 was not well versed in using computers.

b. A day or two after speaking with MURILLO, CW1 received a call from LLERENAS. LLERENAS told CW1 that she worked for EDD and that she operated like a tax preparer. LLERENAS told CW1 that she would prepare CW1's UI application and file it with EDD for a $1,500 fee. CW1 told LLERENAS that $1,500 was a lot of

_____

[11] In 1996, CW1 was convicted of possessing a bad check/money order. In 1998, CW1 was convicted of possessing a check/money order to defraud. In 2004, CW1 was convicted of false checks/records/certs/etc. In 2006, CW1 was convicted for violating parole. In 2010, CW1 was convicted of false checks/records/certs/etc., burglary, and receiving known stolen property. In 2016, CW1 was convicted of possessing a blank check with the intent to defraud, shoplifting, making a fictitious check, forgery with intent to defraud, and obtaining credit using another's ID.

money and that CW1 was willing to pay LLERENAS $100, but not $1,500. LLERENAS told CW1 that they would talk about it later. CW1 provided LLERENAS with CW1's name, Date of Birth (DOB), Social Security Number (SSN), email address, and phone number, which CW1 understood LLERENAS would use to file a UI claim on CW1's behalf.

c.    LLERENAS told CW1 that CW1 would receive a letter from EDD, followed by a debit card from EDD. LLERENAS asked CW1 to send LLERENAS a picture of the debit card once it arrived for LLERENAS' files and paperwork.

d.    Sometime later, CW1 received an EBP debit card in the mail. CW1 sent LLERENAS a picture of the EBP debit card as requested. LLERENAS then told CW1 that CW1 owed LLERENAS $4,000 in addition to the $1,500 she originally quoted to CW1 as the fee for filing the claim. CW1 told LLERENAS that the fee was crazy and refused to pay LLERENAS.

e.    CW1 attempted to use the EBP debit card to make a PayPal transfer to a family member but the transaction was declined. CW1 called BofA and spoke with a representative to determine why the card was not working. The BofA representative told CW1 that a new EBP debit card had been ordered and mailed to an address in Tulare, CA, that was not CW1's address. CW1 believed that approximately $2,000 had been drawn down from CW1's EBP debit card balance. CW1 reviewed each transaction with the BofA representative and discovered that someone had used CW1's EBP debit card at Promo Creek and at a Smoke Shop location in Tulare. CW1 understands that MURILLO works for the Smoke Shop,

although at a different Tulare location than the one where the
EBP debit card had been used.

       f.    CW1 then called LLERENAS and said that CW1 knew
LLERENAS had ordered a new card on CW1's account.  LLERENAS told
CW1 that if CW1 did not pay LLERENAS, CW1 was going to have
problems.  LLERENAS told CW1 that LLERENAS needed to get paid
and, if LLERENAS were paid, then CW1 would not have problems.

       g.    CW1 received 10 additional EBP debit cards in
CW1's name after this conversation.  CW1 asked MURILLO about
these cards and MURILLO told CW1 that LLERENAS was just "messing"
with CW1 because CW1 refused to pay LLERENAS.

    31.  CW1 provided copies of text messages between CW1 and
LLERENAS that were sent between approximately July 9, 2020 and
July 24, 2020.[12]

       a.    In one undated text, LLERENAS told CW1:

"Let's be real[.]
If it wasn't for everything
I've done you wouldn't
have gotten anything
I already told you let the
card arrive pay me and you
will continue getting your
deposits every two weeks
without any issues"

       b.    In a separate undated text, LLERENAS told CW1:

"Look I'm no longer going

---

[12] CW1 provided screenshots of the text messages.  Some of
the screenshots of the messages contain dates and times, while
others do not. I have estimated the time period in which the
text messages were sent based on the dates visible in the
screenshots. The actual time period of the text message
conversation may be broader than these dates.

to work for free
I invested a lot of time
into your claim
First they didn't want to
pay you because you had
a prior false/statement
penalty to serve
Then Burger King was
refusing to allow EDD to
pay you because you left
the job on your own
I got all that crap reversed
and got you the most of
the most so you could be
happy
But obviously with you I
cannot never do enough
for"

32.   EDD Investigator Wilder queried EDD databases and determined the following:

a.   On May 29, 2020, an application for UI benefits was submitted in CW1's name.  The application stated that CW1 was self-employed as a "party-events decorator and desserts baker for the events" and received an annual salary of $65,400.  The application further stated that CW1 was an independent contractor with reportable income (ex. IRS Form 1099) and CW1 had been forced to stop working because COVID-19 had severely limited CW1's ability to continue CW1's customary work activities.

b.   CW1's UI claim was submitted online from IP address 47.148.243.205.  (As discussed in paragraph 42(a), below, this IP address is registered to **SUBJECT PREMISES 1**.)

33.   On October 6, 2020 CW1 told EDD Investigator Wilder that CW1 had never been employed as a party-events planner and desserts baker and had never received an annual salary of

$65,400.  CW1 also stated that CW1 did not work as an independent contractor from 2018 to 2020.

34.  I have reviewed a BofA transaction history statement associated with the EBP debit card that was issued in response to the UI application submitted in the name of CW1.  These records show:

    a.  The initial address provided to BofA for this EBP debit card account is CW1's address.

    b.  The EBP debit card for this account was mailed to CW1's address on or about October 30, 2017.[13]

    c.  On July 10, 2020, CW1's EBP debit card was reported lost or stolen.

    d.  Between July 10, 2020 and August 27, at least 8 replacement cards were ordered and mailed to CW1's address.

    e.  On or about July 13, 2020, a new EBP debit card on CW1's account was mailed to 2003 Essex Ave, Tulare, CA 93274.  According to the California DMV, MURILLO provided 2003 Essex Ave, Tulare, CA 93274 as a mailing address to register her vehicles.

35.  I have reviewed ATM surveillance photos documenting cash withdrawals conducted from July 9, 2020 to August 26, 2020, using the EBP debit card issued to CW1.

---

[13] BofA issued the EBP debit card to CW1 for an unrelated disability insurance claim filed with EDD. BofA does not issue new EBP cards to claimants for new claims. BofA instead reloads existing EBP debit cards with any new benefits that are being provided by EDD.

a.   The review of the ATM surveillance photos revealed that CW1 used the EBP debit card to make cash withdrawals on July 9, 2020.

b.   ATM surveillance footage shows a woman fitting the description of MURILLO[14] using an EBP debit card in the name of CW1 on July 17, 2020 and August 26, 2020.

## 2.   Additional Fraudulent Claims

36.   Based on my training and experience, I know that individuals scheming to fraudulently obtain UI benefits generally follow recognizable patterns, including the following, among others:

a.   Using the identities of other people to file for fraudulent UI benefits in the other persons' names and then collecting the UI funds.  In some instances, the named claimants are victims of identity theft; in other instances, the named claimants have provided their personal identifying information to the schemers and have agreed to pay the schemers a portion of the fraudulent benefits that are obtained; in yet other instances, the named claimants believe they may be entitled to benefits but do not know that the schemers are reporting false information to EDD to fraudulently increase the amount of the benefits claimed.  The fraudulently obtained UI benefits are commonly accessed through ATM withdrawals.

---

[14] My knowledge of MURILLO's physical characteristics is based on my review of MURILLO'S DMV photo.

b.    Using addresses the schemers control as the addresses submitted to EDD for the claims so that EBP debit cards and other EDD correspondence will be mailed to these addresses and thus be accessible to the schemers.  According to EDD records, six claims connected to the scheme described herein were filed using 2003 Essex Ave, Tulare, CA 93274 as the applicant's mailing address.  As set forth in paragraph 34(e), above, this address is connected to MURILLO.  Five of the six claims were filed using IP address 47.148.243.205, which is registered to **SUBJECT PREMISES 1**.  EDD records also show that three claims connected to the scheme described herein were filed using **SUBJECT PREMISES 2** as the applicant's mailing address.

c.    Providing the same phone number or no phone number for multiple UI claims for different claimants.  The phone number is usually one that the schemers control.

d.    Submitting multiple UI claims without providing a driver's license number or state identification number.

37.  Because PUA claims do not require supporting documentation, including Continuing Claim Forms which were temporarily suspended from March 14, 2020 through May 9, 2020, PUA has become a prime target for fraud.

38.  EDD queried its databases regarding the IP address (47.148.243.205) that was used to submit the fraudulent claim for CW1 and discovered that it had been used to file an additional 120 claims with EDD.

39.  EDD also queried EDD databases regarding LLERENAS' phone number (310) 936-2027 and identified two other claims that

used this phone number: one claim filed online from IP address 47.148.242.160 and one claim from filed from IP address 47.155.196.112.  EDD then queried EDD databases regarding the IP addresses 47.148.242.160 and 47.155.196.112 and identified 82 additional claims filed online with EDD using these IP addresses.  To date, a total of 203 claims for PUA benefits have been identified that were filed online using one of these three IP addresses.

40. Through research conducted by the EDD CI Division and my own investigation, I have learned that these 203 claims have other commonalities, as follows:

a.   First, the occupation identified on most of these claims is self-employed.

b.   Second, as discussed in paragraphs 42 and 43, below, 137 claims of these claims were submitted from two IP addresses associated with **SUBJECT PREMISES 1**, and the remaining 66 claims were submitted from an IP address associated with **SUBJECT PREMISES 2**.

c.   One hundred ninety nine (199) of the 203 claims were filed between May 6, 2020 and September 8, 2020.

d.   One hundred twenty four (124) of the 203 claims do not provide a phone number for the named claimant.

e.   Fifty-five (55) of the 203 claims provide email addresses that end in numerals "2020."  For example, the email address provided for claimant D.Z. is D[]Z[]2020@GMAIL.COM.

f.     One hundred thirty seven (137) of the 203 claims do not provide a driver's license number or state identification card number for the named claimant.

41.  From March 15, 2020 to September 8, 2020, EDD paid out approximately $1,012,447 in PUA benefits on the 203 claims that were submitting using one of the three IP addresses associated with **SUBJECT PREMISES 1 and 2.**

### 3.     The Suspect Claims are Connected to LLERENAS and the SUBJECT PREMISES

42.  One-hundred and thirty seven (137) of 203 PUA claims discussed above are connected to LLERENAS and **SUBJECT PREMISES 1** in the following ways:

a.     According to Frontier Communications, CARLOS LLERENAS was the subscriber for IP addresses 47.148.243.205 and 47.148.242.160 at the time the PUA claims were submitted online to EDD from these IP addresses.  CARLOS LLERENAS' Internet service address is **SUBJECT PREMISES 1** and his account remained active as of September 29, 2020.

b.     CARLOS LLERENAS' California Department of Motor Vehicles ("DMV") driver's license with an expiration date of February 2, 2022, identifies **SUBJECT PREMISES 1** as his residential address.

c.     On September 3, 2020, agents queried law enforcement databases and determined that CARLOS LLERENAS and GABRIELA LLERENAS own **SUBJECT PREMISES 1.**

22

      d.     According to EDD, **SUBJECT PREMISES 1** was provided as CARLOS LLERENAS's mailing address on a PUA claim filed with EDD on May 15, 2020, in his name.

      e.     On September 27, 2020, DOL-OIG agents conducted surveillance and observed a red Lexus sedan bearing California license plate number DP509TD parked in the driveway of **SUBJECT PREMISES 1**. According to the California DMV, the vehicle is registered to GABRIELA LLERENAS and CARLOS LLERENAS. The address listed on the DMV registration is **SUBJECT PREMISES 1**.

43. The remaining 66 PUA claims of the 203 claims discussed above are connected to LLERENAS and **SUBJECT PREMISES 2** in the following ways:

      a.     According to Frontier Communications, CDL Income Tax Services[15] was the subscriber for IP address 47.155.196.112 at the time the PUA claims were submitted online to EDD. CDL Income Tax Services' Internet service address is **SUBJECT PREMISES 2** and this account remained active as of October 2, 2020.

      b.     According to a company profile on ptindirectory.com,[16] CDL Income Tax Service is located at **SUBJECT PREMISES 2** and is associated with Carlos D. Llerenas, AFSP.

---

[15] I believe that the "CDL" in the name "CDL Income Tax Services" are the initials of Carlos Llernas' full name, which is Carlos Daniel Llerenas.

[16] ptindirectory is the National Directory of Registered Tax Return and Preparers and Professionals.

**4.   Sample of the Suspect Claims Associated with SUBJECT PREMISES 1**

44. Starting on September 10, 2020, and continuing to the present, I have reviewed the PUA claims that were submitted from the above-referenced IP address 47.148.243.205, which is registered to **SUBJECT PREMISES 1.**  By comparing the personal identification information on these claims with information in a law enforcement database,[17] I was able to identify ten of these PUA claims which appeared to be in the names of individuals with no current residence in California.  I then further investigated these ten claims and determined all of the claims were filed using similar information, as follows:

a.   All 10 of the PUA claimants reported being unemployed because of a "disaster," namely COVID-19.

b.   All 10 of the PUA claimants selected the following self-attestation: "You are an independent contractor with reportable income (ex. IRS Form 1099) and you are forced to stop working because COVID-19 has severely limited your ability to continue performing your customary work activities."

c.   All but one of the PUA claimants reported having no driver's license.

d.   All but two of the PUA claimants reported having no phone number.

///

///

---

[17] The database is TLOxp.

<u>PUA CLAIMANT D.F.</u>

45.   I consulted the law enforcement database regarding the information provided for D.F. on the PUA claim filed in D.F.'s name, and learned the following:

a.   The SSN provided for D.F., ending in 5218, was issued to someone by the name A.B., not D.F.

b.   The database shows that the SSN was issued to a female, while the PUA claim indicates that it belongs to a male.

c.   The database shows that the age of the true SSN holder is 46 years younger than the age reported on the PUA claim for D.F.

d.   The database does not reflect any current residential address for D.F. in California.

<u>PUA CLAIMANT A.C.</u>

46.   I consulted the law enforcement database regarding the information provided for A.C. on the PUA claim filed in A.C.'s name, and learned the following:

a.   The database does not show any record of an A.C. with the SSN used on the PUA claim; indeed, no one by the name A.C. appears in the database.

b.   The SSN provided for A.C., ending in 3997, was issued to someone by the name J.M., not A.C.

c.   The database does not reflect any current residential address for J.M. in California.  The database shows that J.M.'s address is an Army Post Office. According to the Army Criminal Investigation Command, J.M.'s SSN ends in 3997, and J.M. is an enlisted member of the Army

25

stationed in Germany.  J.M. has been enlisted for at least the past five years.  PUA CLAIMANT C.C.

47.  I consulted the law enforcement database regarding the information provided for C.C. on the PUA claim filed in C.C.'s name, and learned the following:

a.  The database does not reflect any current residential address for C.C. in California.

b.  The mailing address provided on C.C.'s PUA claim matches an address provided to the California DMV for MURILLO's vehicle registration.[18]

PUA CLAIMANT E.F.

48.  I consulted the law enforcement database regarding the information provided for E.F. on the PUA claim filed in E.F.'s name, and learned the following:

a.  The database does not reflect any current residential address for E.F. in California.

b.  The mailing address provided on E.F.'s PUA claim matches an address provided to the California DMV for MURILLO's vehicle registration.[19]

PUA CLAIMANT G.S.

49.  I consulted the law enforcement database regarding the information provided for G.S. on the PUA claim filed in G.S.'s

---

[18] On September 3, 2020, CW1 told agents that MURILLO now lives at a different address in the same city.

[19] On September 3, 2020, CW1 told agents that MURILLO now lives at a different address in the same city.

name, and learned the database does not reflect any current residential address for G.S. in California.

### PUA CLAIMANT J.A.

50.   I consulted the law enforcement database regarding the information provided for J.A. on the PUA claim filed in J.A.'s name, and learned the following:

    a.   The database does not reflect any current residential address for J.A. in California.

    b.   The mailing address provided on J.A.'s PUA claim matches MURILLO's current residential address.

### PUA CLAIMANT N.F.

51.   I consulted the law enforcement database regarding the information provided for N.F. on the PUA claim filed in N.F.'s name, and learned the following:

    a.   The SSN provided for N.F. was issued in Nevada.

    b.   The database does not reflect current residential address for N.F. in California.

### PUA CLAIMANT P.A.

52.   I consulted the law enforcement database regarding information provided for P.A. on the PUA claim for P.A., and learned the following:

    a.   The database shows that the SSN for P.A. was issued in Illinois.

    b.   The database does not reflect any current residential address for P.A. in California.

///

///

PUA CLAIMANT FOR V.S.

53.  I consulted the law enforcement database regarding information provided for V.S. on the PUA claim for V.S., and I learned the following:

a.    The database shows that the SSN was issued to M.G., who is male, not V.S., who is female according to the PUA claim.

b.    The database does not reflect any current residential address for M.G. in California.

PUA CLAIMANT FOR X.G.

54.  I consulted the law enforcement database regarding information provided for X.G. on the PUA claim for X.G., which was filed on May 11, 2020, and I learned the following:

a.    The database does not reflect any current residential address for X.G. in California.

b.    The SSN used for X.G. on the PUA claim was used to apply for UI benefits in Puerto Rico on April 30, 2020.

**5.   Sample of the Suspect Claims Associated with SUBJECT PREMISES 2**

55.  Starting on September 10, 2020, and continuing to the present, I have reviewed a random sample of five (5) of the PUA claims discussed above, which were submitted to EDD between April 27, 2020, and September 8, 2020.  Four of these PUA claims were electronically filed from the above-referenced IP address registered to **SUBJECT PREMISES 2** and the fifth claim provided **SUBJECT PREMISES 2** as its mailing address.

<u>PUA CLAIMANT L.M.</u>

56.  I consulted a law enforcement database regarding information provided for L.M. on the PUA claim for L.M., and I learned the database does not reflect any current residential address for L.M. in California.

<u>PUA CLAIMANT R.M.</u>

57.  I consulted the law enforcement database regarding information provided for R.M. on the PUA claim for R.M., and I learned the following:

a.   The database does not reflect any current residential address for R.M. in California.

b.   The address provided on the PUA application filed with EDD is **SUBJECT PREMISES 2.**

<u>PUA CLAIMANT C.F.</u>

58.  I consulted the law enforcement database regarding information provided for C.F. on the PUA claim for C.F., and I learned the database does not reflect any current residential address for C.F. in California.

<u>PUA CLAIMANT A.H.</u>

59.  I consulted the law enforcement database regarding information provided for A.H. on the PUA claim for A.H., and I learned the database does not reflect any current residential address for A.H. in California.

<u>PUA CLAIMANT A.M.</u>

60.  I consulted the law enforcement database regarding information provided for A.M. on the PUA claim for A.M., and I learned the following:

a.    The database does not reflect any current residential address for A.M. in California.

b.    The database shows that the SSN provided for A.M., who is male, was issued to M.P., who is female.

## V.  TRAINING AND EXPERIENCE ON DIGITAL DEVICES[20]

61.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet.  Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

---

[20] As used herein, the term "digital device" includes any electronic system or device capable of storing or processing data in digital form, including central processing units; desktop, laptop, notebook, and tablet computers; personal digital assistants; wireless communication devices, such as paging devices, mobile telephones, and smart phones; digital cameras; gaming consoles; peripheral input/output devices, such as keyboards, printers, scanners, monitors, and drives; related communications devices, such as modems, routers, cables, and connections; storage media; and security devices.

b.    Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.    The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.    Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

62. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

a.    Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.  Also, there are now so many types of digital devices and programs that it is difficult to bring to a search site all of the specialized manuals, equipment, and personnel that may be required.

b.    Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

63. The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

a.    Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye,

and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.    Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress LLERENAS' thumb and/or fingers on the device(s); and (2) hold the device(s) in front of LLERENAS' face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

64. Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VI. <u>ITEMS TO BE SEIZED</u>

65. Based on the foregoing, I respectfully submit that there is probable cause to believe that the items listed in Attachment B, which constitute evidence, fruits and instrumentalities of violations of Title 18, United States Code, Sections 1029, 1040, 1341, and 1349, will be found at **SUBJECT PREMISES 1 and 2.**

///

///

///

///

## VII. <u>CONCLUSION</u>

66. For all the reasons described above, there is probable cause to believe that evidence, fruits and instrumentalities of violations of Title 18, United States Code, Sections 1029 (Fraud and related activity in connection with access devices), 1040 (Fraud in Connection with Emergency Benefits), 1341 (Mail Fraud), 1343 (Wire Fraud), and 1349 (Attempt and Conspiracy to Commit Mail or Wire Fraud) as described in Attachment B of this affidavit, will be found in a search of the **SUBJECT PREMISES 1 and 2**, as further described above and in Attachment A-1 and A-2 of this affidavit.


Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this _____ day of
October, 2020.


_____
HONORABLE CHARLES F. EICK
UNITED STATES MAGISTRATE JUDGE